1

JAURIGUE LAW GROUP
Michael J. Jaurigue (SBN 208123)
   michael@jlglawyers.com

2

Abigail A. Zelenski (SBN 228610)
   abigail@jlglawyers.com

3

David Zelenski (SBN 231768)
   david@jlglawyers.com

4

300 West Glenoaks Boulevard, Suite 300
Glendale, California 91202

5

Telephone:  (818) 630-7280
Facsimile:  (888) 879-1697

6

7

GLANCY PRONGAY & MURRAY LLP
Lionel Z. Glancy (SBN 134180)

8

Mark S. Greenstone (SBN 199606)
1925 Century Park East, Suite 2100

9

Los Angeles, California 90067
Telephone:  (310) 201-9150

10

Facsimile:  (310) 201-9160
E-Mail:  info@glancylaw.com

11

12

*Attorneys for Plaintiff Paul Story*

13

**UNITED STATES DISTRICT COURT**

14

**EASTERN DISTRICT OF CALIFORNIA**

15

16

PAUL STORY, individually and on behalf of all others similarly situated,

17

                    Plaintiff,

18

         v.

19

20

MAMMOTH MOUNTAIN SKI AREA, LLC, a Delaware limited-liability company,

21

                    Defendant.

22

23

24

Case No. 2:14-CV-02422-JAM-DB

**PLAINTIFF'S NOTICE OF <u>UNOPPOSED</u> MOTION FOR PRELIMINARY APPROVAL OF CLASS-ACTION SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

*Assigned to Hon. John A. Mendez*

Date:  November 7, 2017
Time:  1:30 p.m.
Location:  Robert T. Matsui United States
    Courthouse, Courtroom 6, 501 I Street,
    Sacramento, California 95814

25

26

27

28

### NOTICE OF MOTION

PLEASE TAKE NOTICE that, on November 7, 2017, at 1:30 p.m., in Courtroom 6 of the above-entitled Court located at the Robert T. Matsui United States Courthouse, 501 I Street, Sacramento, California 95814, Plaintiff Paul Story will move for an order granting preliminary approval of a class-wide Settlement reached with Defendant Mammoth Mountain Ski Area, LLC ("Mammoth") in the within Action.[1]  As explained in the accompanying Memorandum of Points and Authorities, the Settlement provides for a *non-reversionary* $3.75 million Settlement Fund to compensate Class Members under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, for allegedly improper telemarketing or advertising calls made by Mammoth.  As also explained in the Memorandum, based on historical participation rates in other TCPA actions, Settlement Class Members who submit proper Claim Forms most likely will recover $500.00 each, which arguably is the *maximum* amount that they could recover were this case litigated through trial.  Furthermore, even if all Class Members submit valid Claim Forms, it is estimated that each Class Member will receive a payment of approximately $75.20—an outstanding result relative to other class-wide TCPA settlements.  The Court therefore should preliminarily approve the Settlement as fair, reasonable, and adequate under rule 23(e) of the Federal Rules of Civil Procedure.

The Motion will be made, and based upon, this Notice; the concurrently filed Declarations of David Zelenski and Mark Greenstone; the Memorandum of Points and Authorities appended hereto; the complete record in this action; and such further evidence and argument that may be submitted prior to, or during, the hearing on the Motion.

/ / / / /

---

[1] Capitalized terms used herein have the meanings set forth in the Stipulation of Settlement attached as Exhibit 1 to the Declaration of David Zelenski in Support of Plaintiff's Motion for Preliminary Approval Class-Action Settlement.

Pursuant to the Court's October 15, 2014, Standing Order, Plaintiff states that the required conference of counsel took place starting on May 22, 2017, when Plaintiff and Defendant executed a short-form agreement setting forth the material terms of the Settlement, through September 14, 2017, when the long-form Settlement Agreement was fully executed.

Dated:  October 10, 2017

JAURIGUE LAW GROUP
GLANCY PRONGAY & MURRAY LLP

_____/s/ David Zelenski_____
Michael J. Jaurigue, Abigail A. Zelenski, David Zelenski
Lionel Z. Glancy, Mark S. Greenstone
*Attorneys for Plaintiff*

## MEMORANDUM OF POINTS AND AUTHORITIES

### Table of Contents

I.      Introduction ........................................................................................................ 1

II.     Summary of Plaintiff's Claim and of the Procedural History ........................ 2

    A.      Plaintiff's Alleged Claim for Relief ........................................................ 2

    B.      Procedural History Leading up to Mediation ......................................... 3

    C.      Mediation and the Subsequent Execution of the Settlement Agreement ........... 5

III.    Summary of the Settlement Agreement ......................................................... 5

    A.      The Definition of the Class ...................................................................... 5

    B.      The Settlement Fund ................................................................................ 6

    C.      The Settlement's Limited Release ............................................................ 8

    D.      Notice to the Class ................................................................................... 9

IV.     The Court Should Preliminarily Approve the Settlement ............................ 11

    A.      The Class Should Be Certified ............................................................... 11

    B.      The Settlement Is More than Fair, Reasonable, and Adequate .............. 14

        1.      The Settlement Was the Result of Extensive, Non-Collusive Negotiations ......... 14

        2.      Individual Settlement Payments Likely Will Provide Complete Relief, So There Is No Reason to Doubt the Settlement's Fairness ......... 15

V.      Conclusion ...................................................................................................... 15

*Table of Authorities*

*Cases*

Aboudi v. T-Mobile USA, Inc.
  2015 WL 4923602 (S.D. Cal. Aug. 18, 2015) ...................................................................... 8

Ayala v. U.S. Xpress Enters., Inc.
  2017 WL 3328087 (C.D. Cal. July 27, 2017) ................................................................... 12

Boeing Co v. Van Gemert
  444 U.S. 472 (1980) ............................................................................................................ 6

Class Pls. v. City of Seattle
  955 F.2d 1268 (9th Cir. 1992) ............................................................................................ 9

Collins v. Cargill Meat Solutions Corp.
  274 F.R.D. 294 (E.D. Cal. 2011) ...................................................................................... 11

Ellison v. Steven Madden, Ltd.
  2013 WL 12124432 (C.D. Cal. May 7, 2013) .................................................................... 6

Estrada v. iYogi, Inc.
  2016 WL 310279 (E.D. Cal. Jan. 26, 2016) ................................................................. 7, 11

Estrada v. iYogi, Inc.
  2015 WL 5895942 (E.D. Cal. Oct. 6, 2015) ............................................................... 13–14

Gen. Tel. Co. of Sw. v. Falcon
  457 U.S. 147 (1982) .......................................................................................................... 13

Hanlon v. Chrysler Corp.
  150 F.3d 1011 (9th Cir. 1998) .......................................................................................... 14

Hanon v. Dataproducts Corp.
  976 F.2d 497 (9th Cir. 1992) ...................................................................................... 12–13

Hartless v. Clorox Co.
  273 F.R.D. 630 (S.D. Cal. 2011) ........................................................................................ 8

In re Mego Fin. Corp. Sec. Litig.
  213 F.3d 454 (9th Cir. 2000) ............................................................................................ 13

Landgraf v. USI Film Prods.
  511 U.S. 244 (1994) ............................................................................................................ 2

Linney v. Cellular Alaska P'ship
  151 F.3d 1234 (9th Cir. 1998) .......................................................................................... 14

Mendoza v. Hyundai Motor Co., Ltd.
  2017 WL 342059 (N.D. Cal. Jan. 23, 2017) ............................................................... 14–15

Mogadam v. Fast Eviction Serv.
  2015 WL 1534450 (C.D. Cal. Mar. 30, 2015) ................................................................. 12

Murillo v. Pac. Gas & Elec. Co.
    266 F.R.D. 468 (E.D. Cal. 2010) ................................................................. 13–14

Rodriguez v. W. Publ'g Corp.
    563 F.3d 948 (9th Cir. 2009) ........................................................................ 6, 8

Sanders v. RBS Citizens, N.A.
    2017 WL 363536 (S.D. Cal. Jan. 25, 2017) ...................................................... 6

Six (6) Mexican Workers v. Airz. Citrus Growers
    904 F.2d 1301 (9th Cir. 1990) ........................................................................... 7

Six (6) Mexican Workers v. Ariz. Citrus Growers
    641 F. Supp. 259 (D. Ariz. 1986) ...................................................................... 8

Spann v. J.C. Penney Corp.
    314 F.R.D. 312 (C.D. Cal. Jan. 25, 2016) .......................................................... 9

Staton v. Boeing Co.
    327 F.3d 938 (9th Cir. 2003) ...................................................................... 6, 11

Story v. Mammoth Mountain Ski Area, LLC
    2015 WL 2339437 (E.D. Cal. May 13, 2015) .................................................... 4

Syed v. M-I LLC
    2016 WL 310135 (E.D. Cal. Jan. 26, 2016) ...................................................... 6

Tadepalli v. Uber Techs., Inc.
    2016 WL 1622881 (N.D. Cal. Apr. 25, 2016) ................................................. 15

Wal-Mart Stores, Inc. v. Dukes
    564 U.S. 338 (2011) ....................................................................................... 11

**Statutes and Session Laws**

47 U.S.C. § 227 ....................................................................................... 2–3, 9, 15

Bipartisan Budget Act of 2015, Pub. L. No. 114-74
    129 Stat. 584 ................................................................................................. 2–3

Cal. Civ. Code § 1542 .............................................................................................. 9

**Rules and Regulations**

47 C.F.R. § 64.1200 ............................................................................................ 3–4

Fed. R. Civ. P. 23 .................................................................................. 11, 13–14

Order, In the Matter of Rules and Regulations Implementing the TCPA of 1991
    31 FCC Rcd. 11643 (Oct. 14, 2016) ........................................................... 4, 12

Report and Order, In the Matter of Rules and Regulations Implementing the TCPA of 1991
    7 FCC Rcd. 8752 (Oct. 16, 1992) .................................................................... 4

*Secondary Sources*

Manual for Complex Litigation (Third) (1995) ........................................................................ 11

*I.*     ***Introduction.***

The Parties to the within Action have reached an outstanding result:  an all-cash, non-reversionary $3.75 million Settlement.  In the Action, Plaintiff alleges that, during the period from January 1, 2013, through December 31, 2014, Mammoth made prerecorded- or artificial-voice telephone calls to consumers without first obtaining proper consent, in violation of the TCPA.  The TCPA provides for statutory damages of $500.00 for each such call.  Theoretically assuming that *all* of the estimated 35,337 Class Members submit valid Claim Forms, that *no* Class Members opt out, and that *all* contemplated deductions (*i.e.*, Settlement Administration Expenses, Attorney's Fees and Expenses, and a Service Award to Plaintiff) are approved in full, each Settlement Class Member will receive, at a minimum, approximately $75.20—an amount that exceeds the per-class-member recoveries contemplated by many (if not most) other recent TCPA settlements.  In fact, based on historical participation rates TCPA class actions, *it is more likely that each Settlement Class Member who submits a valid Claim Form will receive an Individual Settlement Payment of $500.00*.  In other words, those individuals who submit valid Claim Forms likely will recover the *full* amount of statutory damages to which they arguably would be entitled were the Action successfully litigated through trial.

That participating Settlement Class Members stand to recover the full amount of their statutory damages is all the more remarkable in light of the Federal Communications Commission's ("FCC") recent decision granting Mammoth a retroactive waiver concerning improper consent.  Under the TCPA, the FCC has the authority to issue rulings that provide for deviations from the TCPA's general rules.  The FCC has provided for a deviation here, granting Mammoth retroactive relief from the enforcement of the TCPA's otherwise applicable written-consent rule, which could potentially eliminate any liability to the Class.  Notwithstanding the FCC's ruling, those Settlement Class Members who submit proper Claim Forms stand to recover, again, the full amount of their statutory damages, without discount.

Furthermore, because the scope of the Released Claims is so narrow—limited, from Class Counsel's perspective, to prerecorded- or artificial-voice calls—all Settlement Class Members will retain the right to pursue litigation against Mammoth for TCPA violations stemming from calls other than those alleged in the Action.  Coupled with the substantial monetary recovery, this represents an excellent result, and the Settlement should be preliminarily approved as fair, reasonable, and adequate.

## II.     Summary of Plaintiff's Claim and of the Procedural History.

### A.     Plaintiff's Alleged Claim for Relief.

In October 2014, Plaintiff filed a Complaint under the TCPA against Mammoth.  (See generally Class-Action Compl. [ECF 1].)  Mammoth operates, manages, and owns a ski resort located in Mono County, California.  (Class-Action Compl. ¶ 8; Mammoth's Ans. to Pl.'s Compl. [ECF 15] ¶ 8.)

In September 2017, Plaintiff filed a First Amended Complaint.[2]  (See generally First Am. Compl. [ECF 71].)  As alleged therein, Plaintiff received two calls on his cellular telephone from Mammoth in April 2014.  (First Am. Compl. ¶¶ 9–10.)  Both calls consisted of a prerecorded or artificial message advertising season passes to Mammoth's ski resort.  (First Am. Compl. ¶¶ 9–10.)

According to Plaintiff, his telephone number was entered into a database containing the numbers of thousands of other consumers to whom Mammoth placed calls similar to his.  (First Am. Compl. ¶¶ 12–14.)  Also according to Plaintiff, Mammoth never obtained proper consent permitting calls to anyone whose number had been uploaded to the database.  (First Am. Compl. ¶¶ 9–10, 14.)  Plaintiff contends that the calls violate the TCPA.  (First Am. Compl. ¶¶ 22–27.)

Under the TCPA, and as to cellular telephones, it is "unlawful . . . to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using . . . an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service."  47 U.S.C. § 227(b)(1)(A).  As to landlines, it likewise is "unlawful . . . to initiate any telephone call to any residential line [*i.e.*, landline] using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes or is exempted by rule or order by the Commission [*i.e.*, the FCC] under paragraph (2)(B)."  Id. § 227(b)(1)(B).[3]  The exemptions referred to in paragraph (2)(B) are limited to "calls that are not

---

[2] The First Amended Complaint was filed to conform the allegations to the information provided by Mammoth in connection with litigating the Action.  Generally speaking, the First Amended Complaint changes the Class definition so that the definition is limited to the period of time during which Mammoth made the allegedly improper calls, namely, January 1, 2013, through December 31, 2014.

[3] This is how the subsections (b)(1)(A) and (b)(1)(B) were worded during the Class Period, again, January 1, 2013, through December 31, 2014.  Since that time, the TCPA has been amended, with a change made to subsections (b)(1)(A) and (b)(1)(B).  However, because statutes generally are to be applied only prospectively, see Landgraf v. USI Film Prods., 511 U.S. 244, 265 (1994), the version of the statute that was in effect during the Class Period is the version applicable here.  In any event, the only relevant change made by the amendment was to include an additional exemption for calls made to collect "a debt owed to or guaranteed by the United States."  Bipartisan Budget Act of 2015, Pub. L. No.

made for a commercial purpose," as well as "such classes or categories of calls" exempted by the FCC. Id. § 227(b)(2)(B).  According, in turn, to the FCC, the additional exempted calls are limited to "commercial" calls that "do[] not include or introduce an advertisement or constitute telemarketing"; calls "made by or on behalf of a tax-exempt nonprofit organization"; or calls that "deliver[] a 'health care' message made by, or on behalf of, a 'covered entity' or its 'business associate,' as those terms are defined in the HIPAA Privacy Rule." 47 C.F.R. § 64.1200(a)(3).  On their face, Mammoth's calls—which did not deliver any health-care messages, were not made on behalf of a tax-exempt nonprofit, and were not initiated for emergency purposes—do not implicate any of these exemptions.

Because none of the exemptions apply, the calling restrictions set forth by the TCPA effectively are the same regardless of whether a call was placed to a cellular telephone or a landline.  Plaintiff therefore seeks to represent a Class of consumers who received, on either their respective cellular telephones or their respective landlines, calls similar to the ones that he himself received.  (See First Am. Compl. ¶ 15.)  Under the TCPA, each such consumer is entitled to recover $500.00 "for each such violation." 47 U.S.C. § 227(b)(3)(B).  According to Plaintiff, none of these individuals provided proper consent, entitling them to the TCPA's statutory-damage amounts.

### B.   Procedural History Leading up to Mediation.

In December 2014, Mammoth moved to stay the Action pending a ruling by the FCC on various petitions concerning the interpretation of the TCPA's consent requirement.  (See generally Mammoth's Notice of Mot., Mot. to Stay, and Mem. of P. & A. in Supp. Thereof ("Def.'s Mot. to Stay") [ECF 17].)  Under the TCPA, the FCC is empowered to "prescribe regulations to implement the requirements" of the TCPA, including the consent requirement.  47 U.S.C. § 227(b).

Mammoth's Motion hinged on the notion that, on October 16, 2013, a new FCC-issued rule took effect clarifying the meaning of "prior express consent," as that term is used in subsections (b)(1)(A) and (b)(1)(B) of the TCPA.[4]  (See Def.'s Mot. to Stay at 4:21–6:26.)  Starting on October 16, 2013, "prior express consent" for telemarketing or advertising calls "mean[t] an agreement, in writing, bearing

---

114-74, 129 Stat. 584.  Because the calls in this case—relating to season-ticket advertisements—cannot possibly be interpreted as calls to collect U.S.-backed debts, the new exemption is entirely irrelevant.

[4] An overview of the issues at play in the Motion to Stay is necessary to understand the key issue in the Action and, in turn, both the propriety of class certification and the risks of continued litigation.

[both] the signature of the person called" and two "clear and conspicuous disclosures": a statement that,

"[b]y executing the agreement, such person authorizes the seller to deliver . . . telemarketing calls

using . . . an artificial or prerecorded voice," and a statement that "[t]he person is not required to sign the

agreement . . . as a condition of purchasing any[thing]." 47 C.F.R. § 64.1200(f)(i).  Prior to the date of

the rule change, "prior express consent" arguably existed, with certain potential scope limitations,

whenever a person simply provided his or her telephone number to a telemarketer.  See Report and

Order, In the Matter of Rules and Regulations Implementing the TCPA of 1991, 7 FCC Rcd. 8752, 8769

(Oct. 16, 1992) ("If a call is otherwise subject to the prohibitions of [the TCPA], persons who knowingly

release their phone numbers have in effect given their invitation or permission to be called . . . .").  The

central issue raised by Mammoth's Motion was, with respect to those individuals who had provided,

prior to the date of the rule change, proper consent under the old rule, what consent standard applied to

messages sent to them on or after the date of the rule change?  Put differently, did Mammoth have to re-

solicit consents containing the new disclosures before making calls to such consumers?

      Mammoth's Motion to Stay pointed to various petitions filed with the FCC in the wake of the

rule change that sought either forbearance from enforcing the new rule or "clarification" that the new

rule did not require the re-solicitation of consent from those consumers who had provided valid consent

under the old rule.  (Def.'s Mot. to Stay at 5:25–6:26.)  Prior to the hearing on the Motion, Mammoth

also filed its own petition with the FCC, likewise arguing that the new rule did not require the re-

solicitation of consent, as well as that the FCC had exceeded its authority in adopting the new rule.

(Def.'s Reply in Supp. of Its Mot. to Stay [ECF 34] at 3:1–25.)  Based on Mammoth's petition, the

Court granted the Motion to Stay, explaining that "[t]he FCC's ruling on this petition will very likely

address, to some extent, the merit of Plaintiff's claim."  Story v. Mammoth, 2015 WL 2339437, at *4

(E.D. Cal. May 13, 2015).  The Action has been stayed since that time.

      In the meantime, in October 2016, the FCC issued an order granting Mammoth's petition in part.

Order, In the Matter of Rules and Regulations Implementing the TCPA of 1991, 31 FCC Rcd. 11643,

11651 (Oct. 14, 2016).  Specifically, the FCC granted Mammoth a "limited retroactive waiver[]" for

calls made "from October 16, 2013[,] through October 7, 2015," to anyone who had provided some form

of written consent to Mammoth.  Id. at 11648–50.  In other words, as to anyone who had consented in

writing, before October 7, 2015, to receive calls from Mammoth, no TCPA liability arguably would attach for calls made through that date regardless of whether the writing failed to include the two new required disclosures.  The FCC's order potentially implicates all of the calls at issue in the Action, since the Class Period stops on December 31, 2014.  (Decl. of David Zelenski in Supp. of Pl.'s Mot. for Preliminary Approval of Class-Action Settlement ("Zelenski Decl.") ¶ 10.)

> ### C.      Mediation and the Subsequent Execution of the Settlement Agreement.

After the FCC had issued its ruling, Plaintiff and Mammoth participated in two all-day private-mediation sessions:  one in March 2017 before the Hon. Leo Papas (Ret.) of Judicate West, and another in May 2017 before the Hon. Edward A. Infante (Ret.) of JAMS.  (Zelenski Decl. ¶¶ 12–14.)  Both mediators have extensive experience with the TCPA and have successfully brokered settlements in several TCPA class actions.  (Zelenski Decl. ¶¶ 12–13.)  In connection with the two mediations, Mammoth provided Plaintiff and both mediators with specific information as to when the telemarketing campaign had taken place, the number of consumers who had been called, and the number of calls that had been placed.  (Zelenski Decl. ¶ 14.)  During the second session, the Parties accepted Judge Infante's mediator proposal, executing a short-form term sheet calling for the establishment of a non-reversionary $3.75 million common-fund.  (Zelenski Decl. ¶ 14.)  Over the next four months, the Parties proceeded to negotiate a long-form Settlement Agreement, which they fully executed on September 14, 2017. (Zelenski Decl. ¶ 14.)

### III.      Summary of the Settlement Agreement.

> ### A.      The Definition of the Class.

Under the Settlement Agreement, the Class consists of "all persons throughout the United States who, during the Class Period [*i.e.*, January 1, 2013, through December 31, 2014], received at least one prerecorded- or artificial-voice telephone call on their respective cellular or landline telephones from [Mammoth], or from any person or entity acting on behalf of [Mammoth], made for a marketing or advertising purpose."  (Zelenski Decl. Ex. 1 at §§ 19, 24.)  Based on the Class Data that Mammoth has compiled, Mammoth called approximately 35,337 unique telephone numbers during the Class Period, meaning that there are a total of approximately 35,337 Class Members.  (Zelenski Decl. ¶ 14.)  Across these 35,337 Class Members, Mammoth placed a total of 45,896 telephone calls.  (Zelenski Decl. ¶ 14.)

*B.      The Settlement Fund.*

For the benefit of these 35,337 Class Members, the Settlement Agreement calls for Mammoth to establish an all-cash, non-reversionary $3.75 million Settlement Fund.  (Zelenski Decl. Ex. 1 at §§ 56, 63.)  Assuming full participation by the Class, this translates into an average gross recovery to Settlement Class Members of approximately $106.12 each.

Of course, under the common-fund theory of recovery, it is appropriate for costs associated with the Settlement to be "spread[] among those benefited by the suit," namely, the Class.  <u>Boeing Co. v. Van Gemert</u>, 444 U.S. 472, 479 (1980).  Pursuant to this doctrine, the Settlement Agreement contemplates that Attorney's Fees and Expenses, as well as the Settlement Administration Expenses incurred by the Settlement Administrator in connection with implementing the Settlement, are to be deducted from the Settlement Fund.  (Zelenski Decl. Ex. 1 at §§ 37, 63, 87.)  This is entirely appropriate.  <u>See</u>, <u>e.g.</u>, <u>Syed v. M-I LLC</u>, 2016 WL 310135, at *9 (E.D. Cal. Jan. 26, 2016) (explaining that, "'under the "common fund" doctrine, a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund'") (quoting <u>Staton v. Boeing Co.</u>, 327 F.3d 938, 967 (9th Cir. 2003)) (internal quotations omitted); <u>Staton</u>, 327 F.3d at 975 (explaining that "[t]he post-settlement cost of providing notice to the class can reasonably be considered a benefit to the class").  Based on these equitable considerations, courts routinely deduct attorney's fees and costs, as well as the expenses of settlement administration, from gross settlement funds.  <u>See</u>, <u>e.g.</u>, <u>Sanders v. RBS Citizens, N.A.</u>, 2017 WL 363536, at *3 (S.D. Cal. Jan. 25, 2017) (under a TCPA class-action settlement, approving the deduction of 25% of the common fund for attorney's fees, as well as a six-figure amount for administration costs).  Courts also often deduct from such funds additional amounts "intended to compensate class representatives for work done on behalf of the class"—*i.e.*, for conferring benefits on unnamed class members who otherwise would not have received anything but for the named plaintiffs' efforts in securing settlement.  <u>Rodriguez v. W. Publ'g Corp.</u>, 563 F.3d 948, 958 (9th Cir. 2009).  <u>See</u> <u>also</u>, <u>e.g.</u>, <u>Ellison v. Steven Madden, Ltd.</u>, 2013 WL 12124432, at *11 (C.D. Cal. May 7, 2013) (approving a $10,000 incentive-award deduction from a class-wide TCPA settlement).

Here, Settlement Administration Expenses are estimated not to exceed $120,000.00 (<u>see</u> Zelenski Decl. ¶ 16), and the Settlement Agreement authorizes a deduction of up to $937,500.00 in attorney's

1    fees, which is equal to 25% of the Settlement Fund, plus additional amounts for Class Counsel's costs,

2    presently estimated to be $30,000.00 (see Zelenski Decl. ¶ 16 & Ex. 1 at § 87).  The reasonableness of

3    these amounts will be detailed in a separately filed motion, to be filed before the period of time that

4    Class Members have to submit Claim Forms, Requests for Exclusion, or objections under the Settlement

5    closes (so Class Members may review the deductions when deciding how to respond to the Settlement).

6    Suffice it to say that the 25% fee request comports with the Ninth Circuit's "benchmark" for common-

7    fund cases.  Six (6) Mexican Workers v. Ariz. Citrus Growers, 904 F.2d 1301, 1311 (9th Cir. 1990).

8    The Settlement Agreement also contemplates a Service Award of up to $5,000.00 to Plaintiff for his

9    services in securing the Settlement and for shouldering the risks of prosecution.  (Zelenski Decl. Ex. 1 at

10   §§ 49, 86.)  Although the reasonableness of the Service Award also will be detailed in the forthcoming

11   motion, Plaintiff here notes that, similar to the 25% fee request, a $5,000.00 payment is "presumptively

12   reasonable."  Estrada v. iYogi, Inc., 2016 WL 310279, at *7 (E.D. Cal. Jan. 26, 2016).

13        After deducting these amounts from the Settlement Fund, the Net Settlement Fund for

14   distribution to the 35,337 Class Members comes to approximately $2,657,500.00.  Under the Settlement,

15   the Net Settlement Fund will be distributed pro rata to those Settlement Class Members who submit

16   valid Claim Forms—i.e., to Authorized Claimants—up to a maximum of $500.00.  (Zelenski Decl. Ex. 1

17   at §§ 16, 64.)  In other words, each Authorized Claimant will receive an amount equal to the Net

18   Settlement Fund divided by the total number of Authorized Claimants, up to a maximum of $500.00

19   each.  (Zelenski Decl. Ex. 1 at § 64.)  Assuming that all of the estimated 35,337 Class Members submit

20   valid Claim Forms and that no Class Members opt out, each Class Member will receive approximately

21   $75.20 (= $2,657,500.00 Net Settlement Fund ÷ 35,337 Class Members).  However, based on

22   participation rates in other TCPA class actions, Plaintiff anticipates that each Authorized Claimant likely

23   will receive an Individual Settlement Payment of $500.00, which is arguably the full amount of statutory

24   damages to which he or she would be entitled were the Action successfully litigated through trial.

25        Because the Settlement Fund in non-reversionary, a portion may remain available after

26   distributing the Individual Settlement Payments to Authorized Claimants.  Under the Settlement, that

27   portion—the Residual Fund—is to be distributed as a cash donation to a Court-approved cy près

28   recipient.  (Zelenski Decl. Ex. 1 at §§ 48, 65.)  Cy près distributions are common in class-wide TCPA

settlements, presumably on account of how such settlements equitably "cap" the amount that any class member can recover under the TCPA's $500.00 ceiling.[5]  See, e.g., Aboudi v. T-Mobile USA, Inc., 2015 WL 4923602, at *4–5 (S.D. Cal. Aug. 18, 2015) ("Based on the number of claims to date, the [s]ettlement provides a $500 benefit to each [q]ualified [c]lass [m]ember.  The TCPA allows recovery of $500 per negligent violation. . . .  As set forth in [p]laintiff's motion, the recovery in this case is much more than the relief provided in other TCPA class settlements that have been approved.  [¶] Plaintiff calculates that at least $1,554,724.53 will be available in the [s]ettlement [f]und to pay [c]lass [m]embers.  Based on the number of claims so far, much of the [s]ettlement [f]und will be paid to the cy près recipients. . . .  [¶] Considering the objectives of the TCPA and the interests of the silent class members, . . . the designated cy près recipients are appropriate.") (internal citations omitted).

"The Ninth Circuit has found that identification of cy près recipients is not ripe until it is determined that there [actually] will be unclaimed funds."  Hartless, 273 F.R.D. at 642 (citing Rodriguez, 563 F.3d at 966).  After all, "[d]etermining the recipient after the claims[] process [has concluded] is [the] logical procedure," since "the amount of unclaimed funds, if any, may affect the choice of charitable organization," and since, "if no funds remain, the court and the parties would waste unnecessary time litigating a non-issue."  Hartless, 273 F.R.D. at 642.  The Settlement Agreement therefore does not designate a specific cy près recipient.  (See Zelenski Decl. Ex. 1 at § 65.)  In connection with seeking final approval of the Settlement, and to the extent that there is a Residual Fund, the Parties will propose a suitable cy près recipient or recipients.

### C. The Settlement's Limited Release.

As defined in the Settlement Agreement, the Settlement Class will release only those claims that

---

[5] Where, as arguably here, "[t]he damages per individual . . . are modest," the distribution of unclaimed funds—which "can be significant in comparison to an individual's . . . damage[s]"—to participating class members would "result in a substantial windfall to [those] class members" and, in turn, would improperly "encourage individuals to bring class actions that will result in large unclaimed damage funds and create conflicts of interest between named plaintiffs and other class members."  Hartless v. Clorox Co., 273 F.R.D. 630, 642 (S.D. Cal. 2011).  The allocation of any Residual Fund to a cy près recipient safeguards against any such perverse incentive.  Cf. Six (6) Mexican Workers v. Ariz. Citrus Growers, 641 F. Supp. 259, 269 (D. Ariz. 1986) ("Simply dividing the remaining funds among the located class members would provide an unacceptable windfall to located class members at the expense of compensating, at least indirectly, the unlocatable class members. . . .  [I]t is better to indirectly compensate the unlocated injured parties through fluid recovery than to return the funds to the defendants . . . .").

are based on the allegations or facts set forth or asserted "in the First Amended Complaint *relating to prerecorded- or artificial-voice telephone calls* made by, or on behalf of, [Mammoth] for a marketing or advertising purpose during the Class Period," *i.e.*, during the period from January 1, 2013, through December 31, 2014. (Zelenski Decl. Ex. 1 at §§ 44 (emphasis supplied), 89.)  Class Counsel submits that all Settlement Class Members therefore will retain the right to pursue litigation against Mammoth for calls other than those set forth in the First Amended Complaint, *e.g.*, litigation for TCPA violations stemming from other calls made with an automatic telephone dialing system, see 47 U.S.C. § 227(b)(1)(A) (establishing restrictions for calls placed not only through the use of "an artificial or prerecorded voice," but also for calls placed using "any automatic telephone dialing system"), from "unsolicited advertisements" sent through "facsimile machines, id. § 227(b)(1)(C), from other calls placed to individuals on the national do-not-call list, see id. §§ 227(c)(3), (c)(5), and from calls placed outside of the Class Period.  This limited release more than fairly balances the rights of absent Class Members against Mammoth's interest in ending the litigation.  See Class Pls. v. City of Seattle, 955 F.2d 1268, 1287–88 (9th Cir. 1992) (noting that unalleged claims may be released if they are based on the same "factual predicate"); Spann v. J.C. Penney Corp., 314 F.R.D. 312, 327–28 (C.D. Cal. Jan. 25, 2016) ("Here, . . . the [s]ettlement [a]greement release[s] claims 'of any and every kind that were asserted in the [l]itigation, or that could have been asserted but were not asserted in the [l]itigation . . . on the basis of, connected with, arising out of, or related in whole or in part to any or all of the alleged acts, omissions, facts, matters, transactions, circumstances, and occurrences that were directly or indirectly alleged' in the litigation.  Additionally, . . . the [s]ettlement [a]greement contains a waiver of rights under § 1542 of the California Civil Code . . . .  [T]he court finds that the release adequately balances fairness to absent class members and recovery for plaintiffs with defendants' business interest in ending this litigation with finality.") (internal citations omitted).

> **D.  Notice to the Class.**

Under the Settlement, the proposed Settlement Administrator—Postlethwaite & Netterville ("P&N")—is to disseminate the Class Notice through several different mechanisms, all designed to cast as wide a net, and to generate as high a response, as practically feasible.  First, P&N will mail a short-form Postcard Notice, including a Claim Form *with prepaid postage*, to the Class via U.S. mail.

1    (Zelenski Decl. Ex. 1 at §§ 67, 69.)  P&N will obtain mailing addresses from Mammoth's Class Data,

2    consisting of every telephone number to which Mammoth's calls were made, along with the name, last-

3    known physical address, and last-known e-mail address associated with each number.  (Zelenski Decl.

4    Ex. 1 at §§ 21, 67.)  According to Mammoth, the Class Data includes names or addresses for

5    approximately 92% and 74%, respectively, of the telephone numbers.  (Zelenski Decl. ¶ 18.)  To the

6    extent that a Class Member's name or address is not in the Class Data, P&N will obtain the name and

7    address through a reverse telephone lookup.  (Zelenski Decl. Ex. 1 at § 67.)  In addition, P&N will

8    update every address obtained—whether from the Class Data itself or from the reverse lookup—through

9    the National Change of Address Database.  (Zelenski Decl. Ex. 1 at § 67.)  Any Postcard Notices that

10   are returned as undeliverable on or before the Claims Deadline—ninety calendar days after the initial

11   date of mailing—will be re-mailed either to the forwarding address provided by the U.S. Post Office or

12   to an updated address determined by P&N through skip-tracing.  (Zelenski Decl. Ex. 1 at §§ 18, 67.)

13          Second, P&N will mail a short-form E-Mail Notice, also including a Claim Form, to those Class

14   Members whose e-mail addresses appear in the Class Data.  (Zelenski Decl. Ex. 1 at §§ 30, 67.)

15   According to Mammoth, the Class Data includes e-mail addresses for approximately 56% of the

16   telephone numbers.  (Zelenski Decl. ¶ 18.)  For all unopened E-Mail Notices that do not "bounce back,"

17   P&N will send an additional E-Mail Notice to those Class Members.  (Zelenski Decl. Ex. 1 at § 67.)

18          Third, P&N will establish a Settlement Website containing relevant information, including all

19   applicable deadlines, the Settlement Agreement, a Long-Form Notice, all papers filed in support of the

20   Settlement, and P&N's contact information.  (Zelenski Decl. Ex. 1 at § 67.)  The Settlement Website

21   will allow Class Members to submit Claim Forms online, and both the Postcard Notice and the E-Mail

22   Notice will specify the Settlement Website's address.  (Zelenski Decl. Ex. 1 at §§ 58, 67, 69.)

23          Copies of the Postcard Notice (and accompanying Claim Form), E-Mail Notice (and

24   accompanying Claim Form), and Settlement Website Claim Form—collectively, the Class Notice—are

25   attached to the Settlement Agreement as Exhibits 6, 7, and 8, respectively.  A review of the Class Notice

26   demonstrates that it includes all of the information required for class-wide-settlement notification:  It

27   describes the nature of the Action, the definition of the Class, and the First Amended Complaint's TCPA

28   claim; it explains that Class Members may enter an appearance through an attorney and that the Court

will exclude those individuals who wish to opt out; it specifies the time requirements and procedure for requesting exclusion and objecting, as well as the binding effect of a class-wide judgment; it describes the essential terms of the Settlement, including all contemplated deductions; it indicates the time and place of the Final Fairness Hearing; it sets forth the formula for allocating and distributing the Settlement Fund; and it prominently displays Class Counsel's contact information for making inquiries. See Fed. R. Civ. P. 23(c)(2)(B) (listing the requirements for class notice); Manual for Complex Litigation (Third) § 30.212 (1995) (setting forth additional items to be included in settlement notices).

### IV.   *The Court Should Preliminarily Approve the Settlement.*

The Court should preliminarily approve the Settlement and order that the above-described Class Notice be disseminated according to the procedures set forth in the Settlement Agreement.  Because the Court has not yet certified the Action to proceed on a class-wide basis, an evaluation of whether the Settlement should be approved takes two steps.  First, the Court must evaluate whether the Action meets the class-certification requirements of rules 23(a) and (b) of the Federal Rules of Civil Procedure; if it does, the Court next evaluates the fairness of the Settlement under rule 23(e).  See, e.g., Estrada, 2016 WL 310279, at *1 ("The Ninth Circuit has declared a strong judicial policy favoring settlement of class actions.  Nevertheless, where, as here, 'the parties reach a settlement agreement prior to class certification, courts must peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement.'") (quoting Staton, 327 F.3d at 952) (internal citation omitted).

### A.   *The Class Should Be Certified.*

Here, the Action meets the four prerequisites of rule 23(a)—numerosity, commonality, typicality, and adequacy—as well as the predominance and superiority prongs of rule 23(b), for the following five reasons.  First, as stated above, there are 35,337 Class Members, which presumptively satisfies the numerosity requirement.  See, e.g., Collins v. Cargill Meat Solutions Corp., 274 F.R.D. 294, 300 (E.D. Cal. 2011) (explaining that "[c]ourts have routinely found the numerosity requirement satisfied when the class comprises 40 or more members").

Second, there is an overriding question of law and fact that predominates over all other questions at issue in this case, and that is capable of resolution for the Class as a whole "in one stroke."  Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011).  The central question is, did Mammoth have sufficient

consent under the TCPA to make the calls?  Plaintiff's case theory here is that, although Class Members may have voluntarily provided their telephone numbers to Mammoth online during an account-signup process (see Def.'s Mot. to Stay [ECF 17] at 3:22–25), that consent is invalid to the extent the online provision of a number is not a "writing."  Again, although the FCC granted Mammoth a retroactive waiver potentially covering all of the calls that Class Members received, that waiver is limited to those individuals who had consented *in writing* under the old rule.  See Order, In the Matter of Rules and Regulations Implementing the TCPA of 1991, 31 FCC Rcd. at 11648–49 ("We find [Mammoth] ha[s] sufficiently demonstrated [it] incorrectly but reasonably interpreted the Commission's [new rule] to mean that [its] old written consents would remain valid after the new rules went into effect . . . . [¶] We emphasize, however, that the waiver[] granted herein only appl[ies] to calls for which some form of *written* consent had previously been obtained.") (emphasis in original).  In other words, even though an old consent form may not have included the disclosures required by the new rule, they retroactively would continue to be sufficient for a limited period.  Plaintiff's position, though, is that providing a number online categorically does *not* constitute a "writing."  See Mogadam v. Fast Eviction Serv., 2015 WL 1534450, at *3 (C.D. Cal. Mar. 30, 2015) (holding that "[the plaintiff]'s placement of his telephone number on the internet is not express written consent to receive advertising or telemarketing [calls]").  Of course, Plaintiff ultimately may be wrong about whether providing a number online constitutes a writing—but whether he ultimately is right or wrong is *not* the relevant inquiry for purposes of certification.  See, e.g., Ayala v. U.S. Xpress Enters., Inc., 2017 WL 3328087, at *10 (C.D. Cal. July 27, 2017) (explaining, with respect to class certification, that "the [c]ourt only asks whether [p]laintiff's *theory* will live or die on a class-wide basis" and that whether the defendant may "ultimately prevail" is not relevant to the certification inquiry) (emphasis supplied).  What matters instead is Plaintiff's theory, and his theory—that no one provided any form of written consent because the provision of a telephone number over the internet is not a writing—is capable of being addressed in a single stroke.

Third, Plaintiff's individual claim is typical of the claims of the Class.  The test for typicality "is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct."  Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992) (internal

quotations omitted).  Here, Plaintiff himself received at least one advertising call from Mammoth during the Class Period after providing his telephone number online.  He thus was subjected to the same conduct to which the Class was subjected, and he suffered the same alleged injury that all Class Members allegedly suffered.  Furthermore, he "seek[s] the same remedy of statutory damages, which would presumably be the same award for each individual injury."  Estrada v. iYogi, Inc., 2015 WL 5895942, at *3 (E.D. Cal. Oct. 6, 2015).  He therefore meets the typicality requirement.

Fourth, Plaintiff and Class Counsel are adequate representatives.  As to adequacy, courts make two inquiries:  "(a) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (b) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  In re Mego Fin. Corp. Sec. Litig., 213 F.3d 454, 462 (9th Cir. 2000).  Here, Class Counsel is unaware of any conflicts with the Class (see Zelenski Decl. ¶ 15), and Plaintiff's individual interest, as explained above, is aligned with those of Class Members, who suffered the same injury that he himself suffered, see Gen. Tel Co. of Sw. v. Falcon, 457 U.S. 147, 157 n.13 (1982) (noting that the typicality inquiry "tend[s] to merge with the adequacy-of-representation requirement").  Class Counsel also is experienced in class-wide litigation and consumer-protection matters, has dedicated substantial resources to the Action's prosecution, and intends to continue doing so throughout the Action's pendency.  (See Zelenski Decl. ¶¶ 3–6; Decl. of Mark Greenstone in Supp. of Pl.'s Mot. for Preliminary Approval of Class-Action Settlement ("Greenstone Decl.") ¶¶ 3–4.)  This satisfies adequacy.

Fifth, class-wide resolution "is superior to other available methods" for adjudicating the Action, since Class Members presumably have a relatively low interest "in individually controlling the prosecution" of their claims—i.e., each Class Member has little incentive to pursue his or her own individual litigation in light of the small statutory-damage amounts at stake—and since there is no other currently pending "litigation concerning the controversy" against Mammoth.  Fed. R. Civ. P. 23(b)(3).[6] (See Zelenski Decl. ¶ 15.)  Approaching the Action on a class-wide basis therefore is superior— especially in light of the substantial recovery amounts made available by the Settlement.

---

[6] Rule 23 additionally lists "the desirability or undesirability of concentrating the litigation of the claims in th[is] particular forum" and "the likely difficulties in managing a class action" through trial as two factors relevant to the superiority analysis.  Fed. R. Civ. P. 23(b)(3)(C)–(D).  Those factors, however, "are irrelevant" when a class action settles, since a settlement means that no trial will occur. Murillo v. Pac. Gas & Elec. Co., 266 F.R.D. 468, 477 (E.D. Cal. 2010).

### B.   The Settlement Is More than Fair, Reasonable, and Adequate.

Under rule 23(e), "[t]he claims . . . of a certified class may be settled . . . only with the court's approval." Fed. R. Civ. P. 23(e).  This process requires the within Court to balance the following:

> the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026 (9th Cir. 1998).  Because "[m]any of these factors cannot be considered until the final fairness hearing, . . . the [C]ourt need only conduct a *preliminary* review at this time to resolve any 'glaring deficiencies' in the [S]ettlement." Estrada, 2015 WL 5895942, at *6 (emphasis supplied).  In other words, "the [C]ourt need only determine whether the proposed [S]ettlement is *within the range* of possible approval," which focuses principally on "whether the proposed [S]ettlement discloses grounds to doubt its fairness or other obvious deficiencies." Id. (quoting Murillo, 266 F.R.D. at 479) (emphasis supplied) (internal quotations omitted).  This also means that the Court should "examin[e] the process that led to the [S]ettlement's terms to ensure that those terms are the result of vigorous, arms-length bargaining." Estrada, 2015 WL 5895942, at *6.

### 1.   The Settlement Was the Result of Extensive, Non-Collusive Negotiations.

As detailed above, the Parties accepted a mediator's proposal to settle this Action.  This strongly implies that the Settlement was the result of arms-length bargaining. See, e.g., id. at *7 ("Settlements reached with the help of a mediator are likely non-collusive") (internal quotations omitted); Mendoza v. Hyundai Motor Co., Ltd., 2017 WL 342059, at *12 (N.D. Cal. Jan. 23, 2017) ("[T]he assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive.") (internal quotations omitted).  Although Plaintiff did not have an opportunity to engage in comprehensive, formal class-wide discovery—on account of the fact that the Action was stayed in 2015—"formal discovery is not a necessary ticket to the bargaining table where the parties have sufficient information to make an informed decision about settlement."[7] Linney v. Cellular Alaska P'ship, 151 F.3d 1234, 1239 (9th Cir. 1998) (internal quotations omitted).  Again, in connection with mediation, Mammoth provided Plaintiff

---

[7] Having said that, Plaintiff notes that he did engage in some formal discovery prior to the Stay, taking the deposition of Mammoth's Vice President of Database Marketing and Research.  (Zelenski Decl. ¶ 8.)

with both the number of consumers who had been called and the number of calls that had been placed—sufficient variables for computing statutory damages under the TCPA.  Class Counsel seriously weighed those computations against the risks of litigation, including the risk that the Court ultimately may hold that the FCC's retroactive waiver permits the at-issue calls, which would wipe out liability altogether. (Zelenski Decl. ¶ 15; Greenstone Decl. ¶ 5.)  Class Counsel also considered that, at trial, the Court might take a more nuanced—as opposed to categorical—approach to the written-consent issue, deciding that whether any given Class Member provided valid written consent depends on what each person actually saw during the online process, which could result in the Class being decertified.  (Zelenski Decl. ¶ 15; Greenstone Decl. ¶ 5.)  In addition, Class Counsel considered the fact that trial likely is still several years away.  (Zelenski Decl. ¶ 15; Greenstone Decl. ¶ 5.)  These facts, coupled with the likelihood that Authorized Claimants likely will "receiv[e] all of their requested relief, . . . strongly suggest[] that the [S]ettlement is non-collusive."  Mendoza, 2017 WL 342059, at *12.  See also Tadepalli v. Uber Techs., Inc., 2016 WL 1622881, at *9 (N.D. Cal. Apr. 25, 2016) ("[T]hat the class is receiving 100% [recovery] reduces the likelihood that the parties colluded . . . .").

### 2. *Individual Settlement Payments Likely Will Provide Complete Relief, So There Is No Reason to Doubt the Settlement's Fairness.*

Again, under the TCPA, each call results in statutory damages of $500.00.[8]  Class Counsel has undertaken a wide-ranging survey of TCPA settlements, and the results indicate that the average per-class-member recovery based on 100% participation by class members is only $2.66.  (Zelenski Decl. ¶¶ 16–17.)  Here, on the other hand, the average Individual Settlement Payment will be *no less than* $75.20, with a very strong chance that Authorized Claimants will receive $500.00 each, placing it at the very top of the TCPA-settlement spectrum.  (Zelenski Decl. ¶ 17.)

## V. *Conclusion.*

For the foregoing reasons, the Court should certify the Class defined in the Settlement Agreement and should preliminarily approve the Settlement.

/ / / / /

---

[8] The TCPA allows damages to be "trebled" for "willful[] or knowing[] violations," 47 U.S.C. § 227(b)(3), but the FCC's ruling—which says that Mammoth had reasonably misinterpreted the consent requirement—provides Mammoth with an argument that trebled damages are not recoverable here.

1

Dated:  October 10, 2017

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JAURIGUE LAW GROUP
GLANCY PRONGAY & MURRAY LLP

_____/s/ *David Zelenski*_____

Michael J. Jaurigue, Abigail A. Zelenski, David Zelenski
Lionel Z. Glancy, Mark S. Greenstone
*Attorneys for Plaintiff*